Swimg, J.
This was an action by a partner, McGrath, to wind up the business of the firm of Cowen & McGrath, a firm carrying on the boot and shoe business in the city of Cincinnati.
The controversy in litigation here is as to the validity of certain chattel mortgages.
The material facts in brief are, on May 20, 1893, and for a period of six years hitherto, the firm of Cowen & Mc-Grath were wholly insolvent. On that day McGrath executed four certain chattel mortgages on the property of the *442 firm for an amount equal to the firm’s assets. There were numerous other creditors unsecured. At this time none of the debts secured were due, and the mortgages were executed without solicitation or knowledge on the part of the mortgagees. The mortgages secured valid debts. Mrs. Cowen, the other member of the firm, was not consulted by McGrath as to the giving of these mortgages, although she was present in the store all of said day. For some time previous to said day, McGrath had been endeavoring to induce Mrs. Cowen to make an assignment of the firm’s assets, but she had persistently refused to do so. On said day, and before delivering the mortgages,bnt after their execution, McGrath had prepared the petition filed in this case, and together with his attorney and the attorney of Mrs. Cowen, who had been attending to her business in other matters, but who in this matter acted'without her knowledge or consent, agreed upon the appointment of a receiver,and who it should be. McGrath .expected that the giving of the mortgage would put an end to the running of the business. The mortgages were delivered on the following Monday morning, the 22nd day of May, and afterwards, on the same morning, this petition was filed and a receiver appointed, and when Mrs. Cowen c’ame to the store on said morning, she found the store closed and in charge of the receiver, and then for the first time she was informed as to what had taken place.
Our conclusion from these facts is: That McGrath having failed to induce Mrs. Cowen to join with him in making an assignment of the firm’s assets, executed these mortgages for the purpose of putting an end to the business, and that he intentionally and purposely concealed from her his .acts in'order that he might carry out this purpose.
The general rule as to the rights and duties of partners is thus stated by Parsons, on Partnership commencing at sec. 108:
*443 “The right of every partner to sell, assign or transfer, any part or the whole of the partnership property, in the way of the regular business of the partnership, is absolute and unquestioned. There is an exception to this rule in reference to the real estate of a partnership, but none as to the personal property. Suppose a partnership delt in buying and selling cotton, and all their stock consisted in five hundred bales stored in New York; there is no more doubt that either one of the partners might sell, and give good title to the whole, than that he could do so with a single bale. This, however, must be done in the regular course of the business of the firm; for outside of this he has no such power. If he does this in fraud of the other partners, that is, if he sells the whole, or any part, intending to run off with the proceeds, and does run off with them, this has no effect on the title of the purchaser, unless he has some knowledge of the fraud.
“If, however, a partner undertakes not to sell the goods or property of the partnership, but to assign them, by way of pledge or mortgage, to secure the debts of the firm, or in any unusual way, he has not necessarily any power to do this. Neither do we consider it certain that he has no power to do it. On the one hand, such a transaction seldom or never belongs to the regular business of a firm. If it does, of course he has this power. If ,it do is not, it may still be so far connected with, or so naturally arise out of or promote, their regular business, that if the transaction be an honest one, without bad faith on the part of any party, we should say it was a valid transaction, which the law would enforce. Perhaps a consideration of the authorities and of the reason of the case would lead to this difference between the selling ánd the assigning in pledge of partnership property by one partner. If the sale take place in the course of business, it would bind the other partners, as we have seen, though fraudulent as to them; but an asssignment in pledge or mortgage, not being in the way of business, would bind the other partners if it were done in good faith for the advantage of the firm, and was reasonable in itself, but not otherwise.
“One partner may, in good faith, ássign a part of the property to pay or secure an existing debt, or a debt to be *444 contracted. (There is some doubt, however, whether he has power to assign the whole property in trust for all the creditors. His power to transfer firm property generally is within the scope of the firm business, since the object of the business is to dispose of such property. But the assignment of all the property in trust for creditors is necessarily outside the scope of the business, since it puts an end to the business. The better opinion therefore seems to ’ be that in the ordinary case one partner has no power to assign all the assets in trust for creditors without the consent of the ether partners. But if the other partners are absent, and can not become at to be consulted, one partner who is thus left in charge of the business may in an emergency make a general assignment.)”
Lindley on Partnership, 1 Yol., p. *126, etseq., says:
‘‘It will be observed that what is necessary to carry on the partnership business in the ordinary way, is made the test of authority where no actual authority or ratification can be proved. This is conformable to the most recent and carefully considered decisions; but by adopting it,the liability of a firm fer the acts of its co-partners is not so extensive as non-lawyers sometimes imagine. The act of one partner, to bind the firm, must be necessary for the carrying on of its business; if all that can be said of it was that it was convenient, or that it facilitated the transaction of the business of the firm, that is not sufficient in the absence of evidence of sanction by the other partners. Nor, it seems, will necessity itself be sufficient if it be an extraordinary necessity. What is necessary for carrying on the business of the firm under ordinary circumstances and in the usual way is the test; and therefore, in a case where the nature of the business was one in which there was no necessity to borrow money to carry it on under ordinary circumstances and in the ordinary manner, the court held the firm not liable for money borrowed by its agent under extraordinary circumstances, although money was absolutely requisite to save the property of the firm from ruin. This case is an authority for saying that a power to do what is usual, does not nclude a power to be what is unusual, however urgent; and although, in the case referred to, the money was *445 not borrowed by a partner, but by a person who was only an agent of the firm, the decision would, it is apprehended, have been the same if he had been a partner. For notwithstanding the fact that every partner is to a certain extent a principal as well as an agent, the liability of his co-partners for his acts can only be established on the ground of agency. As their agent, he has no discretion except within the limits set by them to his authority, and the fact that he is himself, as one of the firm, a principal, does not warrant him in extending those limits, save on his own responsibility.
“The question whether a given act can orean not be said to be necessary to a transaction of a business in the way in which it is usually carried' on must evidently be determined by the business, and by the practice of persons engaged in it. Evidence on both of these points is therefore necessarily admissible, and, as may readily be conceived, an act which is necessary for the prosecution of one kind of business in the ordinary way,may be wholly unnecessary for carrying on another. Consequently no answer of any value can be given to the abstract question, ‘Can one partner bind his firm by such and such an act?’ Unless having regard to what is usual in business, it can be predicated of the act in question either that it is one without which no business can be carried on, or that it is one which is not necessary for carrying on any business whatever. There are obviously very few acts of which any such assertions can be truly made. The great majority of acts, and practically all which give rise to doubt, are those which are necessary to one business and not in another, Take, for example, negotiable instruments; it may be necessary for one member of a firm of bankers to draw, accept or endorse a bill of exchange on behalf of the firm, and to require that each member should put his name to it would be ridiculous; but it by no means follows, nor is it in fact true, that there is any necessity for one of several solicitors to possess a similar power, for it is no part of the ordinary business of a solicitor to draw, accept or endorse bills of exchange. The question, therefore, can one partner bind the firm by accepting bills in its name? admits of no general answer; the nature of the business and the practice of those who carry it on (usage or cus *446 toms ofjthe trade) must be known before any answer can be given.”
The second proposition of the syllabus in the case of Anderson & Wilkins v. Tompkins et al., 1 Brock., p. 456, is as follows: “Where all the partners of a mercantile firm are present, they have a right to be consulted in giving a preference to particular creditors; but this necessity is dispensed with, if one of the partners is absent in a foreign country.” In the body of the opinion of Chief Justice Marshall in this case it is said: “It will be readily conceded that’a fraudulent sale, whether made by deed or otherwise, would pass nothing to a vendee concerned in the fraud, but with this exception I feel much difficulty in setting any other limits to the power of a partner in disposing of the effects of the company purchased for sale. He may sell a yard, a piece, a bale, or any number of bales. He may sell the whole of any article or any number of articles. This power would certainly not be exercised in the presence of a partner without consulting him, and if it were so exercised, slight circumstances would be sufficient to render the transaction suspicious, and perhaps to fix on it the imputation of fraud. In this respect every case must depend on its own circumstances. ‘But in a case perfectly fair, I can perceive no grounds on which it is to be questioned’.”
In a case cited by plaintiff, 66 Fed. Rep. 850, the court say, speaking of the case before them: “There is no suspicion of fraudulent action or intent as to the other partners, or as to unpreferred creditors, beyond the mere fact of preference.”
We take it that the foregoing citations from the authorities fairly state the law applicable to this case, and applying the principles to the facts of this case it seems to us that the mortgage can not stand. That it was a fraud upon the rights of Mrs. Cowen when she was present and could have been consulted,for McGrath to mortgage *447 the assets of the firm to almost their full value, when the only object of McGrath in doing it was to secure certain creditors and at the same time make it necessary for the firm to discontinue business. No creditor secured asked to be secured. It was not in the usual course of the business," and it was not done from any pressing necessity of the business, or to prolong the life of the firm. Its manifest object and intent was to destroy the firm and bring its existence to a close. McGrath purposely kept all knowledge of his acts from his partner, knowing her objections to such a course, in order that he might be able to successfully carry out his purpose in disposing of the firm's property and destroy its existence. It seems to us that such conduct is opposed to the plainest principles of right and justice, and that if was a clear fraud on the rights of Mrs. Cowen, and the rights and obligations of the partnership. Mrs. Cowen had just as much right to prefer creditors as McGrath, and that is what this transaction amounted to when it came to winding up the business or preferring creditors, She not only had that right, but she had the right to know if such a thing was contemplated. Non constat, she may have wanted to prefer certain other creditors, or as far as it appears, she might have been able to pay off these claims or make satisfactory arrangements with the creditors and continue the business. The rights and obligations of partners are mutual, and nothing can be done by either which is not for the benefit of all unless the rights of innocent parties intervene. It is certainly the right of a partner to pay a debt of the firm,but it must be in the usual course of the business and for the benefit of the firm. One partner may also,if the necessity arise,mortgage the property of the firm, but if it be anything out of the ordinary, and the other partner is accessible, he should be consulted — good faith and honest dealing requires this. But here it is clear that Mc-Grath purposely concealed from Mrs. Cowen these transac *448 tions, and almost wholly disposed of the firm’s assets in the securing of certain creditors. It appears to us that to permit such a transaction to stand would be against the clearest principles of right.